FILED SAL
RECEIVED

2010 JAN 14 P 2 50

CLERK
U.S. BANKRUPTCY
DISTRICT OF ARIZONA

Katherine Christensen
1134 West Grand Caymen Drive
Gilbert, Arizona 85233
Tel: (480) 813-3885
Pro Se

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA, PHOENIX DIVISION

| | |
|---|---|
| Katherine Christensen, In Person<br>    Plaintiff,<br>Vs.<br>AURORA LOAN SERVICES LLC,<br>Mr. John Skoba d/b/a CFO AURORA<br>LOAN SERVICES LLC, MCCARTHY<br>HOLTHUS LEVINE LLP, PAUL M.<br>LEVINE, MATTHEW A. SILVERMAN,<br>JESSICA R. KENNY, PERRY &<br>SHAPIRO LLP, CHRISTOPHER R.<br>PERRY, JASON P. SHERMAN, QUALITY<br>LOAN SERVICE CORP. a California<br>corporation, JIM MONTES d/b/a/ Vice<br>President QUALITY LOAN SERVICE<br>CORP. a California corporation,<br>MORTGAGE ELECTRONIC<br>REGISTRATION SYSTEMS INC., JIM<br>MONTES d/b/a/ Vice President<br>MORTGAGE ELECTRONIC<br>REGISTRATION SYSTEMS INC.,<br>GREEN RIVER CAPITAL,<br>COUNTRYWIDE, NORTH AMERICAN<br>TITLE AGENCY OF ARIZONA C/O<br>NORTH AMERICAN TITLE<br>INSURANCE CO., MARICOPA COUNTY<br>SHERIFF OFFICE; CHRIS<br>MCBREARTY, CHARTER FUNDING,<br>FIRST MAGNUS FINANCIAL,<br>MERENDON MINING, INSTITUTE FOR<br>FINANCIAL LEARNING, MERENDON<br>MINING, JOHN DOES And JANE DOES<br>1-100, ABC CORPORATIONS 1-100, and<br>XYZ PARTNERSHIPS 1-100,<br><br>    Defendants, | Case No.: 09-21818-RTB<br>Adversarial Case No. 09-ap-01358-RTB<br><br>CHAPTER 7<br><br>CORRECTED AND SUPPLEMENTAL<br>AFFIDAVIT OF Katherine Christensen IN<br>SUPPORT OF SUPPLEMENTAL<br>COMPLAINT filed 12-31-09 and<br>SUPPLEMENTAL COMPLAINT filed 01-<br>04-10<br><br><br><br><br><br><br><br><br><br><br><br><br><br>Assigned to:  HON. Refield T. Baum |

## **CORRECTED AND SUPPLEMENTAL AFFIDAVIT OF Katherine Christensen IN SUPPORT OF COMPLAINTS**

I, Katherine Christensen, a woman, hereinafter collectively listed as Affiant or Plaintiff, being of adult age, competent to testify, do hereby state that the truths and facts herein are based upon my understanding, beliefs, information and first hand requisite personal knowledge.

Further do I hereby state under the Perjury Clause and proclaim that the following information is true, correct, complete, certain, and not misleading, so help me God.

All information contained within the Affidavit of Katherine Christensen in Support of her Complaints, which was filed into this case on January 4, 2010 is hereby incorporated by reference and added to by the following statements:

1. Affiant is of legal age and competent to testify.

2. Affiant has obtained firsthand knowledge of the facts stated herein

3. Affiant does hereby declare that I have recently received evidence and become aware of the depth and complexity of the bogus mining investment and the improper insider relationship with the mortgage broker Chris McBrearty and how they solicited and bilked investors such as Affiant. Please find attached a complaint by the US Trustee in the Southern District of Florida Bankruptcy Court Chapter 7 Case #09-11958-BKC as Exhibit A.

4. Affiant does hereby declare that there were regular meetings and seminars for investors at which investors were told they would be getting a return on their investment, and that their investments were all backed by gold possessed by Gary Sorenson owner of Merendon Mining.

5. Affiant does hereby declare that she was referred to Chris McBrearty by IFFL as THE mortgage broker to work with, and later met him in person at their international conference where he was introduced onstage as the mortgage broker the company recommended. Investors were encouraged to go to him.

6. Affiant does hereby declare that as part of doing her due diligence on this potential investment opportunity that they paid for her trip to Calgary Alberta to visit the head office, meet their well coached people and attend part of a seminar.

7. Affiant does hereby declare that until I read the complaint in Exhibit A I was unaware that there was more than one Merendon Mining company. Now as a result of this new evidence contained in the trustee's complaint, there appears to be in excess of 30 entities involved and even the Merendon Mining name was split into four (4) different companies that were unknown to me at the time. Defendants conspired to construct complex and sophisticated scheme to defraud and may well rise to a criminal conspiracy as defined in the statutes.

8. Affiant does hereby declare that until I received the evidence and read the complaint in Exhibt A, I was unaware that there was no money made from the investments, rather it was all an elaborate Ponzi scheme.

9. Affiant does hereby declare that until I received and read the complaint I was unaware that the promissory notes that I hold are most likely worthless pieces of paper.

Further, Affiant saith not

DATED:  This 14th day of January in the Year 2010.

Katherine Christensen
1134 West Grand Caymen Drive
Gilbert, Arizona 85233
Tel: (480) 813-3885
Pro Se

JURAT:

SUBSCRIBED AND SWORN TO before me by

Katherine Christensen_____ and substantiates the

authenticity of the Affidavit as true and correct and verifies this statement as what it was

intended to say on this 30th day of December 2009.

Maricopa County

_____ (seal)
Notary Pubic

OFFICIAL SEAL
HAROLD DARCANGELO
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires June 16, 2012

My Commission expires  6-16-2012

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

In re:

**MERENDON MINING (Nevada), INC.**
**a/k/a Milowe Brost,**

Case No.: 09-11958-BKC-AJC

Chapter 7

Debtor.

_____/

### MOTION BY CHAPTER 7 TRUSTEE FOR SUBSTANTIVE
### CONSOLIDATION OF NON-DEBTOR ENTITIES, TURNOVER
### OF PROPERTY OF THE ESTATE, AND INJUNCTIVE RELIEF

MARCIA DUNN, as Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of

MERENDON MINING (NEVADA), INC. (the "Debtor"), files this Motion by Chapter 7

Trustee for Substantive Consolidation of Non-Debtor Entities, Turnover of Property of the

Estate, and Injunctive Relief (the "Motion").

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§157

and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b).

2.      Venue is proper pursuant to 28 U.S.C. §1409.

3.      The statutory predicates for the relief sought in this Motion are 11 U.S.C. §105,

§362, §541, §542, and the general equitable powers of the Bankruptcy Court.

4.      On February 4, 2009 (the "Petition Date"), Eileen McCabe, Jane Otto, and Diane

Kaplan-Berk (the "Petitioning Creditors") filed an Involuntary Petition against the Debtor

requesting an order for relief under chapter 7 of the Bankruptcy Code. [Docket No. 1].

5.      Marcie Dunn was appointed as the Chapter 7 Trustee on June 10, 2009 [Docket

No. 30], and is the acting Chapter 7 Trustee for the benefit of the creditors of the Debtor's estate.

6.     This Motion is being brought in both the main bankruptcy case and in this adversary proceeding, which case was brought on December 15, 2009.

7.     This case arises out of a complex international Ponzi scheme involving the selling of interests in gold mines effectuated by the following individuals (the "Participants"):

A     Milowe or Milo Brost ("Brost"), who is an individual who resides in Alberta, Canada, and is the President of the Debtor. Brost is currently under arrest by the Royal Canadian Mounted Police ("RCMP") and awaiting criminal charges in Alberta, Canada, as a result of the fraudulent scheme outlined in the Adversary Complaint.

B.     Elizabeth Brost ("Elizabeth"), who is Brost's ex-wife, and was the co-founder, officer and director of many of the Non-Debtor Entities as defined below herein. Elizabeth is a Canadian national residing in Honduras.

C.     Gary Sorenson ("Sorenson"), who is an individual who, upon information and belief, is the Chief Executive Office ("CEO") of Merendon Canada, and who resides in Alberta, Canada. Sorenson is currently under arrest by the RCMP and awaiting criminal charges in Alberta, Canada, as a result of the fraudulent scheme outlined in this Adversary Complaint.

D.     Thelma ("Thelma") Sorenson, who is Sorenson's wife, a director and officer of many of the Alter Ego entities, as defined below herein, and is a Honduran national who resides in Boca Raton, Florida.

E.     Larry Adair ("Adair"), who is an individual who resides in Fort Lauderdale, Florida. Adair served as the personal attorney for Gary Sorenson and, upon information and belief, was involved in the creation and formation of the Debtor.

F.     Martin Werner ("Werner"), who is an individual who served as an attorney for both Brost and Sorenson pertaining to Merendon Mining and IFFL matters. Werner is the President of Bahama Resource Alliance, Ltd. and GoldenTrail Management Corporation, two of the Alter Ego Defendants listed herein.

8.     By way of this Motion, the Trustee seeks substantive consolidation of this bankruptcy case with the following non-debtor entities that are owned and/or controlled by Milowe Brost and Gary Sorenson, their wife and ex-wife, and along with the Debtor, are used solely for their personal benefit and to shield assets from their creditors (collectively, the "Non-Debtor Entities"):

a)      Capital Alternatives, Inc. ("Capital Alternatives") is an Alberta corporation incorporated in 1999.

b)      Capital Alternatives (Asia), Inc. ("Capital Alternatives (Asia)") is a corporation, whose place of incorporation is unknown.

c)      The Institute for Financial Learning, Group of Companies, Inc. (the "IFFL") is an Alberta corporation incorporated in 2003, with a principal office in Calgary, Alberta, and the successor to Capital Alternatives.

d)      Merendon Mining Corporation, Ltd. ("Merendon Canada") is an Alberta corporation organized in 1996, with its principal place of business in Calgary, Alberta. Upon information and belief, Merendon Canada is now domiciled in Belize with its headquarters in Honduras. Merendon Canada purportedly owns mining concessions, gold bullion, and a refinery as collateral for investments.

e)      Syndicated Gold Depository, S.A. ("Syndicated Gold") n/k/a Bahama Resource Alliance, Ltd., is a Bahamian corporation which, upon information and belief, operated in Miami, Florida, Panama City, Panama and Nassau, Bahamas.

f)      Strategic Metals, Inc. or Strategic Metals Corporation ("Strategic Metals") was an IFFL related business entity operating in Alberta, Canada. Strategic Metals was purported to be engaging in the business of financing mining operations.

g)      Merendon Mining (Colorado), Inc. ("Merendon Mining (Colorado)") is a Colorado corporation, with its principal place of business in Broomfield, Colorado.

h)      Merendon Mining (Arizona), Inc. ("Merendon Mining (Arizona)") is a Nevada corporation, with its principal place of business in Las Vegas, Nevada.

i)      Merendon Mining (California), Inc. ("Merendon Mining (California)") is a Nevada corporation, with its principal place of business in Las Vegas, Nevada.

j)      True North Productions, LLC ("True North Productions") is a Nevada corporation, with its principal place of business in Las Vegas, Nevada.

k)      Merendon Mining, Inc. ("MMI") is a corporation, whose place of incorporation is unknown.

l)   Merendon de Honduras S.A. de C.V. ("Merendon Honduras"), is a Honduran corporation.

m)   Merendon de Venezuela C.A. ("Merendon Venezuela"), is a Venezuelan corporation.

n)   Merendon de Peru S.A. ("Merendon Peru"), is a Peruvian corporation.

o)   Merendon de Ecuador S.A. ("Merendon Ecuador"), is an Ecuadorian corporation.

p)   Consumer Debt Recovery Trust/ Heritage Financial, S.A. ("Heritage") is a legal entity whose corporate status and place of incorporation is unknown.

q)   C.D.R.T. Program ("C.D.R.T.") is a legal entity whose corporate status and place of incorporation is unknown.

r)   Steller (Stellar) Trust Services, Ltd. ("Steller") is a legal entity whose corporate status and place of incorporation is unknown.

s)   360 Earth Resources, Ltd. or 3sixty Earth Resources, Ltd. ("360") is a Cypriot legal entity.

t)   Sterling Trust ("Sterling") is a legal entity whose corporate status and place of incorporation is unknown.

u)   Base Metals Corporation ("Base") is a Nevis West Indies corporate body.

v)   Arbor (Arbour) Energy, Inc. ("Arbor") is an Alberta corporation.

w)   Evergreen Management Services, LTD ("Evergreen") is a Nevis West Indies corporate body.

x)   Quatro Communication Corporation ("Quatro") is an Alberta corporation.

y)   Alluvial United Inc. ("Alluvial") is a corporation whose place of incorporation is unknown.

z)   Bearstone Capital Management Inc. ("Bearstone") is a British Columbia corporation.

aa)   Bridgewater & Co. Inc. ("Bridgewater") is a corporation whose place of incorporation is unknown.

bb)   Cascadia Management Services S.A. ("Cascadia") is a foreign company whose corporate status and place of incorporation is unknown.

cc)     Expedia Logistics Inc. ("Expedia") is an Alberta corporation.

dd)     Fortris Business Systems, Inc. ("Fortris") is a Belize corporation.

ee)     Nordic Merchant Credit Union ("Nordic") is a credit union whose place of incorporation is unknown.

ff)     Onyx Trading Group LLC ("Onyx") is a limited liability company whose place of incorporation is unknown.

gg)     Perma Securities S.A. ("Perma") is a foreign company whose corporate status and place of incorporation is unknown.

hh)     Steller Management Services ("SMS") is a legal entity whose corporate status and place of incorporation is unknown.

ii)     Tena Capital Corporation or Tena Capital Fund ("Tena") is a corporation whose place of incorporation is unknown.

jj)     Transciones Universal S.A. ("TU") is a foreign company whose corporate status and place of incorporation is unknown.

kk)     Watchers International Transit Ltd. ("Watchers") is a legal entity whose corporate status and place of incorporation is unknown.

ll)     GoldenTrail Equity Management Limited Partnership ("GoldenTrail Equity") is a legal entity whose corporate status and place of incorporation is unknown.

mm)     GoldenTrail Management Corporation ("GoldenTrail Management") is a corporation whose place of incorporation is unknown.

nn)     i E Group, Inc. ("i E Group") is a corporation whose place of incorporation is unknown.

9.     In addition to substantive consolidation of the above Non-Debtor Entities, the Trustee requests that this Court enter an order declaring that certain property in possession of the Non-Debtor Entities is property of the estate pursuant to §541, and that the Trustee is entitled to turnover of such property pursuant to §542.

10.     Further, the Trustee requests that this Court enter an order enjoining the Non-Debtor Entities, and the Participants, from taking any action or executing any document consistent with their continued ownership or control of potential property of the estate, and further preventing all persons with knowledge of this action and the bankruptcy case from proceeding against or exerting ownership or control over these entities and assets to the detriment of the Trustee and the Debtor's Estate, and extending the automatic stay over the assets of the Non-Debtor Entities.

11.     In support of this Motion, the Trustee states as follows:

## **FACTUAL BACKGROUND**

12.     The factual background for the relief sought in this Motion is contained in the affidavits of Paul Garfinkle and Barry Mukamal, attached hereto, and incorporated by reference, as Exhibits A and B to the Adversary Complaint.

### **Brost, Sorenson and the IFFL**

13.     Beginning on or around 1999, Brost began conducting seminars or financial workshops whereby he would teach the attendees how to maximize their assets by moving them from non-performing to performing assets.

14.     The goal of the presentations were to raise money from the people who participated in the seminar and convert them into investors in Brost's businesses. Brost did this by showing investors that he could provide them with a 37% annual return by leveraging their passive assets, primarily the equity in their homes, and thereby assure them of their financial freedom. In his presentations, Brost stated that if a participant in his investment scheme borrowed equity from their home, business, IRA or any other non-performing asset and invested it with him, they would see that money earn about a 36% annual return on those funds. If the

participant were to let that money grow, the compounding interest reinvested would allow the participant to achieve financial freedom in between 5 and 10 years.

15.   The vehicle through which these opportunities were offered was Capital Alternatives, an Alberta corporation, which later became the IFFL sometime around 2003. The IFFL was formed as a substitute vehicle for servicing Brost's program goals and participant investors. Participants not only made investments as directed by Brost, but they were also told to set up their own corporate entity from which they would draw salary as a corporate manager. However, these corporations were not managed by the participant because in reality Brost and his company managed the investment of the funds.

16.   Capital Alternatives, and later the IFFL, had investment programs that would allegedly bring annual returns on investment of between 15-36% to its investors. Those programs included gold mining projects in Honduras, Canada, and later the U.S. States, a defaulted credit card debt program, and other similar programs.

17.   Brost was partners with an individual named Gary Allen Sorenson ("Sorenson"). Brost and Sorenson solicited investors for a variety of investment opportunities in which the mining enterprise was just one enterprise. Brost's part in the enterprise was to run Capital Alternatives, which was to be the member network and the sales force. Once the participants were found they became a part of Capital Alternatives, later the IFFL, by investing in several different projects such as Strategic Metals, and other Canadian based investments.

18.   Sorenson had acquired gold mines located in Canada, and developed these mines for investment through a Canadian company, Merendon Mining, Inc. ("MMI"), through a subsidiary or affiliate called Merendon Mining Corporation, Ltd. ("Merendon Canada") both

located out of Calgary, Alberta, Canada. Brost and Sorenson were partners in these mining operations in Canada, as well as a refining operation located in Honduras.

19.    The programs offered by Brost morphed and changed over time, but the gold mining operations remained the backup assurance of investment success and security for the participants. Brost represented to his audiences at these seminars that all investment dollars which he and his various companies were receiving from investors were fully secured and backed by gold reserves from mining operations. In 2001 and 2002, the principle gold mining operation was in Honduras.

20.    At times, IFFL members and investors would be invited to Honduras to view the refining operations.

21.    When the IFFL members arrived in Honduras, Brost and Sorenson put on a presentation for the assembled group wherein they explained how Sorenson's mining operation could afford to pay investors more than a 30% return on their money by utilizing private as opposed to bank money, and that all of the investor money was secured by gold bullion stored within the vaults at the Honduras refinery. Sorenson made a point of informing the group about the extent of the money that Brost and his sales groups had made available for the mining operation, and that both he and Brost had become extremely wealthy as a result of all of the investor money that was being funneled into their mining operations.

22.    Sorenson took the groups on a tour of the refinery, which was a part of a huge guarded complex in Tegucigalpa, Honduras that was fully equipped with the latest state of the art equipment.

23.    Sorenson also took groups on a tour of his jewelry operations and explained that some of the gold which he was refining was being used to create and design custom jewelry. The

mining operation had a retail jewelry outlet connected with the refinery, and Sorenson would invite participants into the store so they could meet with his staff and, if they wished, buy some of the jewelry from his shop.

24.    Some of the participants bought jewelry from Merendon Mining in Honduras. Upon information and belief, several of the participants had their purchases appraised when they returned to the U.S., and were informed that the jewelry that they purchased was overpriced and not of the quality as represented. Upon completing the various Honduran tours, Sorenson and his wife, Thelma, would invite the group back to have a final dinner at his home.

25.    The IFFL became the vehicle through which Brost and Sorenson introduced the programs to investors, but they used different interrelated sub-entities to actually raise the money.  This included, but was not limited to, the Merendon entities in Central and South America – Merendon de Honduras S.A. de C.V. ("Merendon Honduras"), Merendon de Venezuela C.A. ("Merendon Venezuela"), Merendon de Peru, S.A. ("Merendon Peru"), and Merendon de Ecuador S.A. ("Merendon Ecuador") (collectively, the "South American Merendon Mining Entities"), and the soon-to-be formed Merendon Mining entities in the United States. A more extensive list of these interrelated sub-entities are set forth in the exhibit to the Debtor's Schedule B, Item # 13.

### U.S. Merendon Mining Entities

26.    In 2002, Brost began the process of bringing Merendon Mining to the United States. It was around this time that Paul Garfinkle ("Garfinkle") was introduced to Brost at one of Brost's financial workshops held in Fort Lauderdale, Florida.

27.    At the time he met Brost, Garfinkle held a Power of Attorney over some gold mining properties in Colorado, and had a gold mining opportunity here in the United States.

They began to discuss Brost possibly acquiring those assets for some of his programs, through his Merendon Mining investment vehicles. Brost wanted to see some of the reports and paperwork on these opportunities, so Garfinkle sent Brost geologist reports and information concerning the mining opportunity, maps and other supporting documentation. The name of the mine was The Glory Hole, also known as Chain-O-Mines, located outside of Denver in Central City, Colorado (the "Glory Hole Mine"). The title to the Glory Hole Mine was in litigation between Harold Caldwell ("Caldwell") and Judge Robert Barnes. Garfinkle presented the Glory Hole Mine to Brost as an opportunity for Capital Alternatives, and the related Merendon Mining enterprise, to acquire an interest for the benefit of their investors.

28.     Upon reviewing the information on the Glory Hole Mine, Brost wanted to acquire the mine for the Merendon Mining investments, and said he would fund the litigation as well as the ongoing operations. Brost did not explain how he was going to fund the litigation and operations of the Glory Hole Mine, except that Sorenson and his investment group, through one of their Merendon Mining investment vehicles, would fund the litigation and thereafter develop the mine. Brost and Sorenson funded some of the litigation through an entity called Merendon Group Encumbrance ("Merendon Encumbrance"), but it was later evident that the monies to fund the litigation with regard to the Glory Hole Mine and to subsequently acquire additional U.S. mines were coming out of investor money. In particular, the monies used to acquire these mines came from the investors of what eventually turned into the Debtor, Merendon Mining (Nevada), Inc.

29.     Glory Hole was later transferred into the name of Sentinel Mining Corp. ("Sentinel"), a Colorado corporation, for which Brost served as an office and director, and Garfinkle was the registered agent. Ward Capstick ("Capstick"), an individual from Seattle,

Washington served as the original registered agent for Sentinel, and was Brost's right hand man. Capstick ran the sales operations for all the Brost and Sorenson companies, including all the Merendon Mining ventures.

30.    In either late 2003 or early 2004, Brost hired Bradley Regier ("Regier") as his treasurer and chief financial officer (CFO) for the Merendon Mining project, and ultimately became the CFO for all of Brost's matters.

31.    The first Merendon Mining company in the United States, Merendon Mining (Nevada), the Debtor, was formed in Nevada on December 30, 2002, to begin to develop the Glory Hole Mine and other mining opportunities. However, there were other existing or ongoing companies which were all part and parcel in the overall Merendon Mining, Brost and Sorenson operation. The purpose of the initial U.S. Merendon Mining company was to take over the Glory Hole Mine and enter into contracts with Caldwell. This first Merendon Mining entity was also to be used to acquire another Colorado property called the Silver Plume Mine (the "Silver Plume Mine"), then owned by Abe Barnhart ("Barnhart").

32.    Sorenson, had his personal lawyer from Fort Lauderdale, Larry Adair ("Adair"), working for and involved with the entity, and was involved in its creation and formation.

33.    Brost and Sorenson hired another Florida attorney named Martin Werner ("Werner") to represent Brost and Sorenson in various legal matters pertaining to both the Merendon Mining and IFFL issues. Werner had previously represented Atlantic and Garfinkle, and they had introduced him to Brost. Werner's brother facilitated the purchase of a condo for them in the ICON building located at 450 Alton Road, Miami Beach, Florida 33131, Suite 2903, which would then serve to become Debtor's corporate headquarters.

34.    Later Werner moved to Panama when he became the legal confidant and

representative for Sorenson. Upon information and belief, Werner is the President of a Bahamian company owned and controlled by Sorenson called Syndicated Gold Depository S.A., which is now known as Bahama Resource Alliance, Ltd. ("Syndicated Gold"). Syndicated Gold was developed in response to the changing financial situation within the IFFL and the need for Brost and Sorenson to find new ways to bring in investors, participants, members, and money for their enterprises.

35.     Merendon Mining (Nevada) was the first of several interconnected and intertwined Merendon Mining corporate entities established in the U.S. for the purposes of acquiring interests in American gold mines and operations, and their related offshore manufacturing or smelting facilities.

36.     Merendon Mining (Nevada) was intended to be the holding company for all the U.S. Merendon Mining acquisitions. Brost and Sorensen acted together as sort of co-chief financial and co-chief operating officers, and in such capacity they controlled this and all the other Merendon Mining operations, both in the U.S. and abroad. The two of them were the singular active participants, the directors and the parties in complete control over all of these interconnected and related entities' affairs. All of the properties and companies were under the direct and strict control and supervision of Brost and Sorenson, who along with members of both their families held their interests through closely held partnerships.

37.     It was also at this time that a fund called the "SOD Fund" was developed and investors were given numbered bank accounts from which they could monitor their investment returns, if they chose that form of investment. Also at that time, the secondary investments, such as the collection upon credit delinquency were either dropped or were not presented as a part of the IFFL package, with all of the focus being on the Merendon Mining ventures.

38.     As of July, 2, 2003 Brost also created a Mining Interest Development Action Strategy ("MIDAS") program, and opened a MIDAS Fund office in Fort Lauderdale. Brost and other structurists used that office to conduct sales seminars to potential investors within the U.S.

39.     Brost formed Merendon Mining (Colorado) on November 5, 2003 in the State of Colorado. Subsequently, Merendon Mining (Colorado) was to merge into and become part of Debtor. On October 5, 2004, amended and restated Articles of Incorporation were filed with the Nevada Secretary of State changing the name of the Debtor, Merendon Mining (Nevada), Inc. to Merendon Mining (Colorado), Inc., a Nevada corporation. Thus, the Debtor, Merendon Mining (Nevada) n/k/a Merendon Mining (Colorado), a Nevada corporation, and Merendon Mining (Colorado), a Colorado corporation, have identical names, and were intended to be one and the same entity.

40.     Brost maintained bank accounts at US Bank in Colorado, and all of the investor monies were initially deposited into those accounts. The funds to acquire each of the American mines for the Merendon Mining companies (in Colorado, Arizona, California and Nevada) came through US Bank in Boulder, Colorado under the Debtor, Merendon Mining (Nevada) n/k/a Merendon Mining (Colorado), a Nevada corporation. Investor funds were deposited, commingled and used to pay a variety of expenses for each of the separate mines owned or to be acquired by each of the separate companies. All the Merendon Mining entities were created as part of Brost's scheme to defraud investors, and were to be operated as a single entity under the Debtor as the umbrella corporation, with the goal of acquiring mining properties, putting them into operation, getting the gold concentrate, and then sending the gold to Sorensen in Honduras for processing by Merendon Honduras, the refinery owned by Sorenson, where the smelting and manufacturing of the gold would take place.

41.     The Debtor, under different corporate umbrellas, would be the entity that acquired the various mining operations. There are four American based Merendon Mining companies: (1) Debtor, Merendon Mining (Nevada) n/k/a Merendon Mining (Colorado), a Nevada corporation, (2) Merendon Mining (Colorado), a Colorado corporation, (3) Merendon Mining (Arizona), a Nevada corporation, and (4) Merendon Mining (California), a Nevada corporation, collectively, the "U.S. Merendon Mining Entities". Each of the companies had interests in, acquired, or had contracts to buy various mining properties within the United States.

42.     All five of the mines listed on the Debtor's Schedule A were purchased with investor money, raised through the IFFL, placed in the Debtor's accounts at US Bank in Colorado, and contracted for by the Debtor, notwithstanding what corporate entity ultimately acquired title to the mines. The legal descriptions for those mines and their names are attached to the Adversary Complaint as Exhibit C, and shall collectively be referred to as the "American Mines".

43.     The "Discovery Day" Mine located in California was purchased by the Debtor through its wholly owned subsidiary, known as Merendon Mining (California), a Nevada corporation, formed on July 13, 2005. Merendon Mining (Arizona), another Nevada corporation, was formed on August 31, 2008 to acquire the "Gold Basin" mine in Dolen Springs, Arizona. The "Bueno" and "Black Rose" mining properties located in Jamestown, Colorado, were purchased in the name of Merendon Mining (Colorado).

44.     While the individuals who physically worked at a particular mine would work solely for that mine and rarely visit or perform work for or at other mines, all of the U.S. Merendon Mining Entities had the same corporate employees, all of whom served the same role and function no matter which entity for which they were performing a particular task. Les Taylor

("Taylor"), an individual who had previously worked with Sorenson in his other operations, came to work as Director of Mining Operations for all the Merendon Mining companies, particularly the U.S. Merendon Mining Entities.

45.    Sorenson and Brost had created Merendon Mining, and the U.S. Merendon Mining Entities were all a part of this large worldwide complex run under the Merendon or Merendon Mining name, whether it was in Canada, the United States, or Central and South America.

46.    Brost and Sorenson would form a separate corporation for each of their entities as needed. There was never a clear delineation from company to company as Brost and Sorenson considered all of the companies as one and the same enterprise to defraud the investors.

47.    There were regular meetings, mine tours, and seminars for investors. At each of these seminars, the investors were told that they would be getting a return on their investment, and that their investments were all backed by gold possessed by Sorenson. However, the investors were never advised as to how or in which Merendon Mining entity the funds were being invested. As far as Brost and Sorenson were concerned, it was all one enterprise whether it was Canada, the United States, or Honduras, and it was all treated, and presented to the investors, as one and the same enterprise.

48.    The investors were not given a choice as to which Merendon Mining entity they wanted their money invested. There was no delineation between the four companies - it was all "Merendon Mining." When an investor went to an IFFL meeting, he or she would be solicited to invest in "Merendon Mining," without any distinction between Merendon Mining (Colorado), Merendon Mining (Nevada), Merendon Mining (Arizona), or Merendon Mining (California). Rather, the investor was sold on the singular Merendon Mining enterprise, operated as an

umbrella through the Debtor, encompassing the entire American, Canadian and Honduras companies and their operations, along with other related entities controlled by Brost and Sorenson.

49.     There were no oral or written representations or documentation advising any of the investors that their money was being invested in one Merendon Mining entity over another, or otherwise explaining to the investor that their money was being invested to acquire a specific mine. Funds were raised solely from investors with no investment from the principals. Expenses for the mines were paid without discrimination as to which mine was owned by which company. Whether it was the cost to maintain any particular property, to hire a geologist, or retain an attorney for a closing, the principals dipped into the one source of money maintained in the US Bank accounts comprising the monies raised from the investors, regardless of its source, or which company or mine for whose benefit the expenditure was to be made.

50.     A review of the Debtor and its affiliates' bank statements and other financial documentation reflects the commingling of investor money.

51.     While Brost, Capstick and Regier on their face maintained separate books and records for different companies, the entities were treated as if they were all one enterprise. Within the Merendon Mining scope of companies, there were no separate books and records for the Debtor, Merendon Mining (Colorado), Merendon Mining (Arizona), or Merendon Mining (California).

52.     The Merendon Mining corporate insiders completely and routinely disregarded the corporate formalities.

53.     Notwithstanding that the investor monies were used to finance the acquisition and operations of the five American Mines, only a small amount of the investor money was ever

actually used for the U.S. mining acquisitions. The bulk of the money that was raised by investors for IFFL to acquire mining interests in the United States was transferred to Sorensen.

54.     This is supported by the analysis of the US Bank records conducted by Mukamal, Trustee's forensic accountant, which revealed that the primary source of cash inflows into the US Bank accounts were investor funds, transfers from affiliates, and other unidentified deposits. A significant portion of the cash inflows were by wire transfer; and for each incoming wire the records included the transferee name. The names of the transferees were cross-referenced with a list of investors names to determine which transfers constituted investor funds. While the source of the unidentified deposits could not be ascertained, the vast majority of these were round large dollar amounts (e.g. $200,000.00, $100,000.00), which suggested that they were attributable to investor monies rather than commercial business operations.

55.     The majority of the cash outflows from the US Bank accounts were to affiliates and related parties, although there were outflows for the purchase and upkeep of mining assets, and repayments to investors. In the aggregate, the Debtor transferred $128,924,227.28 to the Debtor's principals, affiliates, and related parties ("Related Party Transfers"). Transfers to these recipients totaled $123,796,740.72, which was more than 75% of the total cash inflows into the US Bank accounts of the Debtor.

56.     The largest recipients of the Related Party Transfers were:

a)      True North Productions, a Nevada limited liability company for which Brost is the Managing Member ($53,400,346.00);

b)      Larry Adair/Larry Adair, P.A./Larry Adair Trust, the personal lawyer of Sorenson and involved is most aspects of Merendon Mining (Nevada) ($34,171,894.72);

      c)      Martin M. Werner/Martin Werner Attorney Trust account, the attorney who represented Brost and Sorenson in various legal matters pertaining to both Merendon Mining and IFFL issues ($32,247,000.00);

      d)      Aurelian Consulting, LLC, a Nevada limited liability company, whose members include Capstick and which has the same address as listed for Brost as a member of True North Productions ($2,336,000.00); and

      e)      Merendon Mining (Colorado) and Merendon Mining (California) ($875,000.00).

57.     Upon information and belief, the Debtor deposited funds into these accounts for further dissemination to other entities such Syndicated Gold, which monies would then flow from Syndicated Gold into different bank accounts around the world controlled by Sorenson.

58.     The Debtor made a payment in the amount of $100,000,000 to Syndicated Gold, which was represented by a promissory note from Syndicated Gold to the Debtor. Upon information and belief, as collateral for the loan, Syndicated Gold provided the Debtor with a profit participation in the South American Merendon Mining Entities - Merendon Honduras, Merendon Ecuador, Merendon Peru, and Merendon Venezuela.

59.     Upon information and belief, the actual amount of money raised in the operations by Brost and Sorenson, and under their management, was between $1.2 to $5 billion from between 3,000 to 4,000 investors in Canada, the United States and others worldwide.

60.     In 2005, Brost, Sorenson and Capstick attempted to overcome legal handicaps presented by an investigation by the Alberta Securities Commission ("ASC") by issuing eight month Promissory Notes to their investors, including almost $150,000,000 from the Debtor itself. Brost and Sorenson restructured the investors' transactions so that their investment would

be evidenced by a short term promissory note issued by the Debtor as the maker of the note, to the investor. The investor would advance the funds to Debtor, and it was represented by Brost and Sorensen that these notes would be repaid from the revenue generated by these mines owned by the various Merendon Mining companies.

61.    In reality, this was not what happened as no real money was being made from the mining operations. Some investors were paid off out of new money that was raised from new investors. In total, only about $15,000,000 was ever returned to the initial Merendon Mining companies investors. While there was some minimal development work performed on the mines, Brost and Sorenson basically pocketed the money, with most of the funds being siphoned off and funneled to Sorenson, through his refinery, house, and equipment in Honduras.

62.    All told, while the promissory notes affiliated with the Debtor represented between $130,000,000 to $150,000,000, upon information and belief, Brost and Sorenson have raised between $1.2 billion and $5 billion through their various investment vehicles which is unaccounted for among 4,000 investors within the United States (1,000 participants) and Canada (approximately 3,000 participants).

63.    On May 2, 2008, Debtor's Officers and Directors issued a memorandum to the investors indicating Debtor's default on its promissory notes to them, and advised its investors that Debtor, along with its subsidiaries in Colorado, Arizona and California, was changing its name to US-WEST Mining (Nevada) Corporation. In its notice of default, Debtor offered its investors the option to convert their notes to an annuity paid by an insurance company created by Syndicated Gold or to renew their notes, and then proceeded to describe the litany of then pending government administrative and criminal investigations and proceedings brought against Debtor, its affiliates, its principals, and management.

64.     The money raised for the Merendon Mining investment opportunity was used to support the other companies and business opportunities of Sorenson and Brost. The companies for which investor money was raised and went into are those identified on Debtor's Schedule B, Item # 13, and the schedule attached to the same. Of those funds, some went through US Bank, while other funds reached the companies through different bank accounts and platforms around the world.

### Pending Administrative and Criminal Investigations

65.     Both Brost and Sorenson have histories dating back to 1998 with the ASC for a number of violations, including fraud, lying to investors and trading in securities while not being registered with the commission.

66.     ASC investigations into Merendon Canada, Strategic Metals, Arbor and the IFFL have been ongoing for years, with a number of penalties and trading bans being issued over the past decade.

67.     Brost, Sorenson, Regier, and others have not only been sued by the ASC, but are under criminal investigation by both Canadian and United States authorities.

68.     The Internal Revenue Service ("IRS"), in conjunction with the Department of Justice ("DOJ"), had been conducting an investigation of the Debtor in connection with the MIDAS program. This investigation then expanded to include the program surrounding the Debtor's issuance of promissory notes to its investors, including IFFL and Syndicated Gold's role in the same, along with the management of each of those entities, and the investigation apparently also includes a grand jury investigation brought by the DOJ in the Eastern District of New York.

69.     Two civil suits have also been brought in Houston and Seattle by the DOJ against accounting professionals to bar them from promoting the MIDAS program as an unlawful tax scheme involving bogus gold mining deductions involving the Debtor and the IFFL.

70.     The Colorado office of the Securities and Exchange Commission (the "SEC") also has a pending investigation against the Debtor, its subsidiaries, affiliates and management, arising from violations of U.S. securities laws arising from the Debtor's fundraising.

71.     On March 21, 2008, the State of Washington Department of Financial Institutions, Securities Division, has also brought actions against the IFFL Strategic Metals, Merendon Canada, Brost, Capstick, Kristina J. Katayama, Ronald R. Case, and Warren L. Bosma, who also comprise the Debtor's officers and directors, and other accounting professionals, with respect to the sale of unregistered securities in that state.

72.     In March 2008, the Canadian Revenue Agency launched simultaneous raids on key IFFL figures.

73.     As part of a class action lawsuit brought by defrauded investors, on September 22, 2008, a Calgary Court appointed Michael Quilling as Receiver to recover the remaining assets from Strategic Metals. The money held by Strategic Metals has been seized by the receiver appointed over it in Canada. Strategic Metals and the IFFL records were kept in their offices in Calgary, and were seized by Canadian regulatory authorities in 2005.

74.     On September 15, 2009, Brost was taken into custody and arrested by the Royal Canadian Mounted Police ("RCMP"), at which time an arrest warrant was also issued for Sorenson by the RCMP.

75.     On or about September 30, 2009, Sorenson was also arrested by the RCMP.

**Harm to the Investors**

76.     Brost and his sales staff convinced investors to mortgage all of their properties and give Brost and Sorenson all of the financing proceeds with promises they would all be receiving a monthly cash flow that would be more than sufficient to allow them to meet their monthly incurred obligations.   These investors are now stuck having to pay the incurred indebtedness without receiving any of the promised cash flow. Some of the investors have already lost their homes and farms, and one female investor has committed suicide in Canada. As the days and weeks go by there is more and more anguish from this large body of investors.

77.     Many of these investors are taking matters into their own hands, and have created "Investor Recovery Groups" whereby they solicit investors for money to be used to fund a private investigation into all these matters, and try to recover the assets stolen from them by the perpetrators of this fraud, and bring them to justice. However, many of these so called private investor groups are no more then fronts run by former structurists who are attempting to deflect their own potential civil or criminal liability from themselves, and are in fact interfering in attempts to recover monies on behalf of these investors.

78.     Lastly, these investors are further harmed because of substantial tax liabilities they are incurring notwithstanding that they documented their substantial losses from these schemes. Currently the Internal Revenue Service ("IRS") and various state tax regulators are still attempting to tax all of the participants for their participation in these investments even after their loss is evident. The IRA rollovers have recognition by the IRS as legitimate; however, there are still difficulties since the IRS will not allow a theft loss deduction without a final determination of loss by this Court. Without conclusive evidence or a judicial determination that a loss exists the IRS will not allow the investors a theft loss deduction.

79.     Upon information and belief, numerous assets of the Non-Debtor Entities, which may be determined to be property of the Debtor's bankruptcy estate, have been and are currently being currently liquidated by Brost and Sorenson for their benefit and to the detriment of the investor creditors of Debtor.

## RELIEF REQUESTED

### Substantive Consolidation of Non-Debtor Entities

80.     For the reasons set forth herein, substantive consolidation of the Non-Debtor Entities in this case is necessary, appropriate and in the best interests of the estate and its creditors.  The concept and remedial relief afforded by substantive consolidation is rooted in the general equitable powers of the Bankruptcy Court. *See, e.g., Eastgroup Properties v. Southern Motel Assoc., Ltd. (In re Southern Motel Assoc., Ltd.)*, 935 F.2d 245 (11th Cir. 1991); *Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515 (2nd Cir. 1988); *Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.)*, 810 F.2d 270 (D.C. Cir. 1987).  The central feature of substantive consolidation is "to ensure the equitable treatment of all creditors." *In re Murray Indus.*, 119 B.R. 820 (Bankr. M.D. Fla. 1990). Generally, the assets of the consolidated entities are pooled and the liabilities are paid from the combined source. *In re Augie/Restivo Banking Co.*, 860 F.2d at 518.  At the same time, substantive consolidation jettisons the inter-company liabilities of the consolidated entities. *Holywell Corp. v. Bank of New York*, 59 B.R. 340, 347 (S.D. Fla. 1986).

81.     The bankruptcy courts have found that substantive consolidation of a debtor with a non-debtor entity is appropriate where, as here, there is substantial identity among the entities to be consolidated and the value of assets of the estate will be maximized to the benefit of creditors. *Munford, Inc. v. TOC Retail, Inc. (In re Munford), 115 B.R. 390 (Bankr. N.D. Ga.*

1990); *In re Alico Mining, Inc.*, 278 B.R. 586 (Bankr. N.D. Fla. 2002). In *Muriford*, the court described the theory of recovery:

> [S]ubstantive consolidation may be based on a finding that it would be more equitable to all parties to allow consolidation under the circumstances of this case (citations omitted) by showing that the affairs of the entities are inextricably intertwined or that the creditors dealt with them as a single economic unit, and does not require a finding of fraud or intent to hinder or delay creditors.

*In re Munford*, 115 B.R. at 394.

82.     Furthermore, the Eleventh Circuit has recognized substantive consolidation when 'the economic prejudice of continued debtor separateness' outweighs 'the economic prejudice of consolidation.' Therefore, the court must conduct a "searching inquire to insure that consolidation yields benefits offsetting the harm it inflicts on objecting parties." *In re Southern Motel Assoc., Ltd.*, 935 F.2d at 249. The Eleventh Circuit has followed and adopted the modem trend for determining whether substantive consolidation is warranted. The modem trend recognizes that there is a "widespread use of interrelated corporate structures by subsidiary corporations operating under a parent entity's corporate umbrella for tax and business purposes" *In re Southern Motel Assoc., Ltd.*, 935 F.2d at 249. This recognition is appropriate in this case. Pursuant to this standard, "the proponent of substantive consolidation must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit. When this showing is made a presumption arises that creditors have not relied solely on the credit of one of the entities involved. *Matter of Lewellyn*, 26 B.R. 246, 251-252 (Bankr. S.D. Iowa 1982). Once the proponent has made this prima facie case for consolidation, the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation. *Id.* (citing *In re AutoTrain*, 810 F.2d at 276). The

Eleventh Circuit has also suggested that the proponent of substantive consolidation may be guided by the following factors to establish its prima facie case:

(1)  The presence or absence of consolidated financial statements;

(2)  The unity of interests and ownership between various corporate entities;

(3)  The existence of parent and intercorporate guarantees on loans;

(4)  The degree of difficulty in segregating and ascertaining individual assets and liabilities;

(5)  The existence of transfers of assets without formal observance of corporate formalities;

(6)  The commingling of assets and business functions;

(7)  The profitability of consolidation at a single physical location;

*In re Southern Motel Assoc., Ltd.*, 935 F.2d at 249-250 (citing, *In re Gainesville P-H Properties, Inc.*, 106 B.R. 304, 306 (Bankr, M.D. Fla. 1989).

83.    In reviewing these factors, and applying them to this case, it is evident that the balance weighs in favor of substantive consolidation.

84.    Brost and Sorenson presented their investment enterprise without any delineation or differentiation between any of the Non-Debtor Entities, and investors were not given a choice as to which entity they wanted to invest. Thus, to the ordinary investor and/or creditor, it is indistinguishable as to the ownership of properties, generation of revenues and financial results between the Debtor and the various Non-Debtor Entities which made up the Merendon Mining enterprise.

85.    The Debtor was set up as the holding company for all of the American Merendon Mining acquisitions, with Brost as the primary principal of the Debtor, Merendon Mining (Colorado), Merendon Mining (California), Merendon Mining (Arizona), as well as Capital Alternatives and the IFFL which were the vehicles for soliciting investor funds. However, the

money raised for the Merendon Mining investment opportunity was used to support the other Non-Debtor Entities and business opportunities of Brost and Sorenson.

86.    There is no true segregation of liabilities between the Non-Debtor Entities, as Brost and Sorenson utilized investor funds to continue operation of the enterprise as a whole. It is clear that aggregating the totality of the Non-Debtor Entities' assets along with the Debtor's estate shall generate and produce excess proceeds which may be available for distribution to the creditors of this estate.

87.    Further, it is unlikely that substantively consolidating the Debtor and the Non-Debtor Entities would prejudice or harm the creditors of the Non-Debtor Entities. Any secured creditors shall retain their priority of distribution from the assets of the Non-Debtor Entities upon consolidation, and to the extent that a secured creditor has a valid perfected mortgage lien on a property owned by a Non-Debtor Entity, such mortgage lien shall be paid in accordance with its priority upon sale by the Trustee.

88.    Thus, on balance, the benefits to the estate out weighs prejudice to creditors and these factors should weigh in favor of substantive consolidation of the Non-Debtor Entities into the Debtor's estate.

89.    Given the above factors, substantive consolidation is appropriate in this case to allow the Trustee to maximize and preserve the value of assets available to satisfy creditor claims against the estate and to avoid further harm to creditors by virtue of the collapse of Brost and Sorenson's investment scheme.

90.    Moreover, the relief requested in this Motion should be granted *nunc pro tunc* to the Petition Date of February 4, 2009. *See First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Financial Services, Inc.)*, 974 F.2d 712, 721 (6th Cir. 1992); *In re Creditors Service*

01/15/2010

*Corp.*, 195 B.R. at 690 n. 7; *Evans Temple Church v. Carnegie Body Co. (In re Evans Temple Church)*, 55 B.R. 976, 982 (Bankr. N.D. Ohio 1986). Accordingly, substantive consolidation of the Consolidated Entities with the Debtor's bankruptcy estate is necessary, appropriate and in the best interests of the estate.

### Property of the Estate and Turnover

91.    Section 541(a) of the Bankruptcy Code broadly defines property of the estate to include, in relevant part, "all legal or equitable interests of the debtor in property as of the commencement of the case," regardless of where the property is located, or who holds it. *In re American Way Service Corp.*, 229 B.R. 496, 535 (Bankr. S.D. Fla. 1999).

92.    As already alleged, the Debtor was the holding company for all of the American Merendon Mining acquisitions, with Brost as the primary principal of the Debtor, Merendon Mining (Colorado), Merendon Mining (California), Merendon Mining (Arizona), as well as Capital Alternatives and the IFFL which were the vehicles for soliciting investor funds. Brost and Sorenson utilized investor funds to continue operation of the enterprise as a whole, and as such, there is no true segregation of assets and liabilities between the Debtor and Non-Debtor Entities.

93.    Therefore, although not titled in the name of the Debtor, the Debtor has a legal or equitable interest in the following property which is in the possession, custody, or control of various Non-Debtor entities, and is thus, property of the estate:

a)    Title to Discovery Day Mine, California;

b)    Title to Gold Basin Mine, Dolen Springs, Arizona;

c)    Title to Black Rose Mine, Jamestown, Colorado;

d)    Title to Bueno Mine, Jamestown, Colorado;

e) Title to Glory Hold Mine, Gilpin County, Colorado;

f) Title to the manufacturing (smelting) facility in Honduras and Gold and Jewelry Showroom in Tegucigalpa, Honduras;

g) Title to the mineral, gas, and oil rights associated with (a) – (e);

h) Title to the equipment and inventory associated with (a) – (f);

i) Title to the gold, and finished gold products, associated with (a) – (f);

j) U.S. Bank Account #1-036-5825-8183, Broomfield, Colorado;

k) U.S. Bank Account #1-536-547-8251, Clackamas, Oregon;

l) U.S. Bank Account #2-943-4257-2582, Broomfield, Colorado;

m) U.S. Bank Account #1-036-5825-8191, Broomfield, Colorado;

n) Stocks and interests in the businesses as listed on Exhibit 1 to Schedule B, item #13, which are also defined as the Alter Ego Defendants; and

o) Bank Account of Capital Alternatives (Asia).

94.    Furthermore, section 542(a) of the Bankruptcy Code requires that any entity in possession, custody, or control of property that the trustee may use, sell, or lease must deliver it to the trustee and account for the property unless it is of inconsequential value or benefit to the estate.

95.    The above property in the possession, custody, or control of the Non-Debtor Entities is property that the Trustee may use, sell, or lease, and is therefore of consequential value and benefit to the estate, and the Trustee should be entitled to turnover of said property pursuant to §542 of the Bankruptcy Code.

## **Injunctive Relief**

96.    The Trustee seeks an injunction as to the Non-Debtor Entities under Federal Rule of Bankruptcy Procedure 7001(7) and 7065, and 11 U.S.C. §105, as to any actions to

misappropriate, divert, or otherwise remove the proceeds of assets that may be property of the estate beyond the Trustee's reach.

97.     Federal Rule of Bankruptcy Procedure, section 7065, incorporates Federal Rule of Civil Procedure section 65(b), and provides that a bankruptcy court may grant an applicant's request for a temporary restraining order or preliminary injunction if the requesting party indicates that: (1) there is a substantial likelihood that the movant will prevail on the merits; (2) the movant will suffer irreparable harm unless the injunction is granted; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; (4) the injunction, if granted, would not be adverse to public interest and (5) there is no adequate remedy at law. *In re Trafford Distributing Center, Inc.*, 414 B.R. 849, 856 (Bankr. S.D. Fla. 2009); *In re Prime Motor Inns,* 131 B.R. 233 (Bankr. S.D. Fla. 1991).

98.     For a permanent injunction, the standard is essentially the same as that for a preliminary injunction, except that the movant must establish actual success on the merits, as opposed to a likelihood of success. *In re Trafford,* 414 B.R. at 856; *KH Outdoor, LLC v. City of Trussville,* 458 F.3d 1261, 1268 (11th Cir.2006) (citing *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 546 n. 12 (1987)).

99.     The likelihood of an ultimate success on substantive consolidation and finding the above-mentioned assets to be property of the estate are extremely favorable.

100.    The estate will be irreparably damaged if the Non-Debtor Entities are entitled to continue acting as if they own and control assets which are property of the estate, including the misappropriation, diversion, or liquidation of such assets.

101.    The injury to the creditors of the estate outweighs whatever damage the proposed injunction may cause the opposing party, as preventing the misappropriation, diversion, or

liquidation of these assets may allow the thousands of creditors injured by this fraudulent scheme some recovery for their loss.

102.    Based upon the best information of the Trustee, no relief requested herein is against any public policy considerations recognized at law or equity. To the contrary, the relief requested is consistent with all relevant public policy and equitable considerations.

103.    The Trustee lacks an adequate remedy at law as a practical matter. The equitable relief requested herein is required to prevent the likely further dissipation of assets in the event that injunctive relief is not granted.

104.    Additionally, the "Investor Recovery Groups" claiming to represent the interests of various investor/creditors have been engaging in independent collection activity, both judicially and extra judicially, nationally and internationally, to try and secure assets for the benefit of certain creditors and not for the benefit of the entire creditor body, and have otherwise been interfering with the Trustee's efforts to secure these assets for the benefit of the estate.

105.    Section 362(a) of the Bankruptcy Code bars acts by creditors outside the bankruptcy case to exercise control over property of the estate. 11 U.S.C. §362(a)(3).

106.    As such, the Trustee further requests that the automatic stay be extended over these assets and that all persons with knowledge of this action and bankruptcy case be enjoined from proceeding against or exerting ownership or control over these entities and assets to the detriment of the Trustee and the Debtor's Estate.

WHEREFORE, the Trustee respectfully requests that this Court enter an order:

(a)    substantively consolidating the estate of the Debtor and the Non-Debtor Entities;

(b)    declaring the property listed in ¶93 above property of the estate pursuant to §541 of the Bankruptcy Code;

(c)    requiring the Non-Debtor Entities in possession, custody, or control of said property to turnover such property, or the value of such property, to the Trustee pursuant to §542 of the Bankruptcy Code;

(d)    granting the Trustee the authority to use, sell or lease those assets under §363 of the Bankruptcy Code,

(e)    granting temporary and permanent injunctive relief prohibiting Brost, Sorenson, and the Non-Debtor Entities from misappropriating, diverting, liquidating, or otherwise removing assets or the proceeds of such assets that may be property of the estate;

(f)    extending the automatic stay under 11 U.S.C. §362 enjoining all persons or entities with knowledge of this bankruptcy case from interfering with the Trustee's administration of these assets; and

(g)    granting such any such other and further relief as this Court deems necessary and appropriate.

### **Reservation of Rights**

The Trustee reserves the right to amend and supplement this Motion upon completion of further due diligence in order to include additional Non-Debtor Entities and other related business entities which may own assets that have equity for the benefit of creditors.

### **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this Motion will be served along with the adversary complaint in this action, and a notice of hearing of this motion, upon all named defendants at their last known address, and that a separate certificate of service will be filed, indicating those defendants upon which service was able to be effectuated.

Dated: December 17, 2009

GRAYROBINSON, P.A.
*Attorneys for Plaintiff, Marcia Dunn,*
*Chapter 7 Trustee*
401 E. Las Olas Boulevard, Suite 1850
Fort Lauderdale, FL 33301
Phone 954-761-8111/Fax 954-761-8112

By:  /s/ Ivan J. Reich, Esq.
Ivan J. Reich, Esq.
Florida Bar No.: 0778011

\303450\1 - # 182799 v1